UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

| In re:<br><br>Nicole Nason Hill,<br><br>                      Debtor | Chapter 7<br>Case No. 18-20337 |
|---|---|
| Robert Andrade,<br><br>                      Plaintiff<br>v.<br><br>Nicole Nason Hill,<br><br>                      Defendant | Adv. Proc. No. 18-2013 |

## MEMORANDUM OF DECISION

On October 7, 2019, the Court conducted a trial on Mr. Andrade's complaint seeking a determination that certain debts owed to him by Ms. Hill should be excepted from her chapter 7 discharge under 11 U.S.C. § 523(a)(4). For the reasons that follow, a judgment will enter in favor of Ms. Hill.

## FACTUAL BACKGROUND

The following facts are drawn from the evidence admitted at trial, including an order issued by the Virginia Circuit Court for York County-Poquoson (the "Order"). Any findings essential to the Order are given binding and preclusive effect here, to the extent those findings are relevant to the subject of this litigation. *See* Petrucelli v. D'Abrosca (In re D'Abrosca), BAP No. RI 10-062, 2011 WL 4592338, at *4 (B.A.P. 1st Cir. Aug. 10, 2011) ("Preclusion principles apply to actions seeking to except debts from discharge."); Applebee v. Brawn (In re Brawn), 138 B.R. 327, 330 (Bankr. D. Me. 1992) (explaining that federal courts generally accord a state

court judgment the preclusive effect it would receive under the law of the state in which it was rendered); Lee v. Spoden, 776 S.E.2d 798 (Va. 2015) (discussing principles of res judicata, including issue preclusion, under Virginia law).

Mr. Andrade is a resident of Virginia. Ms. Hill is currently a Maine resident, but previously lived in Virginia. In 2011, Mr. Andrade and Ms. Hill entered into a general partnership for the purpose of sharing the profits and losses of a 7-11 franchise store located in Virginia. Mr. Andrade and Ms. Hill agreed to share all profits and losses of the store equally. They did not, however, execute a written partnership agreement. To obtain the franchise, Ms. Hill drew up a business plan in which she referred to Mr. Andrade as her "managing partner." In that plan, Ms. Hill stated that Mr. Andrade would help her with all aspects of the franchise, and that she and Mr. Andrade would be on hand daily to cover between one-third and two-thirds of all hours in the store.

At the outset of their enterprise, Mr. Andrade or Ms. Hill or both of them obtained four sources of financing: (1) a loan from 7-11 in the amount of $65,000 (the "7-11 Loan"); (2) advances from Mr. Andrade in the amount of $16,500 (the "Andrade Loan"); (3) a loan from Andrade, LLC in the amount of $40,000 (the "LLC Loan"); and (4) a loan from Albert Pianalto, a relative of Mr. Andrade, in the amount of $41,000 (the "Pianalto Loan"). The parties did not memorialize these financing arrangements; they did not execute written loan documents or promissory notes.

Ms. Hill ultimately obtained a 7-11 franchise in her name alone. In the franchise agreement, Ms. Hill agreed to be solely responsible for her own income taxes related to the store. She also agreed that she would not transfer her interest in the franchise without the prior written

consent of the franchisor.  In a form attached to the agreement, she designated Mr. Andrade as her successor to the franchise.

The store began operating in February 2012.  When Ms. Hill and Mr. Andrade formed the partnership and opened the store, they were in a personal relationship.  At some point, that relationship ended, and the business partnership encountered difficulties.  Ms. Hill believed that the partnership terminated in the summer of 2012 when Mr. Andrade was unable or unwilling to put in the hours at the store to be a 50/50 partner.  Mr. Andrade believed that he was not obligated to put in 50% of the hours to maintain his partnership interest given his contribution to the store's financing.  In 2014, Ms. Hill asked Mr. Andrade not to return to the store.

At all times, Ms. Hill controlled the distribution of funds generated by the store.  The 7-11 Loan was paid monthly, according to its terms, from the store's receipts.  When the store first opened, the parties shared personal finances, and Ms. Hill put most of the money she derived from the store into Mr. Andrade's account.  For a while, Mr. Andrade was employed at the store and received a salary.  Ms. Hill managed the store on a full-time basis from its inception in 2012 until she later obtained outside employment and hired a manager.  From that time on, she continued to work at the store in the evenings.  In 2012, Ms. Hill took "weekly draws" from the store totaling $35,900.  From 2013 to 2016, Ms. Hill's "weekly draws" totaled $52,000 each year.  For the three-month period ending in March 2017, her "weekly draws" totaled $13,000.  Ms. Hill did not receive a salary or wages in addition to these weekly draws and believed that the draws constituted compensation for the time she spent working at the store.

After the parties' relationship ended and Mr. Andrade stopped working at the store, the parties made oral agreements about the terms on which he would be paid, and Ms. Hill tried to abide by those agreements.  Various payments were made to Mr. Andrade, Andrade, LLC, and

Mr. Pianalto on an irregular basis from May 2012 through June 2016 from the revenue produced by the store. The parties agreed that Mr. Andrade could allocate these payments among the Andrade Loan, the LLC Loan, and the Pianalto Loan.

In mid-2016, Mr. Andrade, Andrade, LLC, and Mr. Pianalto sued Ms. Hill in Virginia for breach of partnership agreement and breach of contract. Ms. Hill counterclaimed, asserting that Mr. Andrade should be held liable for half of the loans extended to the store.

In October 2016, Ms. Hill withdrew $15,000 from the store as an "additional draw." She withdrew these funds to pay her personal income taxes after using the funds she had previously set aside for that purpose to cover a family medical emergency. She did not obtain Mr. Andrade's permission to make this withdrawal and did not believe she needed that permission: she thought the partnership had terminated and that she was operating as a sole proprietor.

In June 2017, the parties executed a settlement memorandum in which they agreed to work in good faith to transfer the store to Mr. Andrade. They also agreed that, upon the transfer of the store, Ms. Hill would be released from any liability for the loans made by Mr. Pianalto, Mr. Andrade, and Andrade, LLC, or for any other matter raised in the complaint. They further agreed that Ms. Hill would not withdraw any funds from the store in excess of $1,000 per week in draws until a transfer of the store or the entry of a court order. Ms. Hill tried to transfer the store to Mr. Andrade but ran into several hurdles. She had to leave the state to provide care for her family and learned that she would be unable to keep the store in operation from out of state. She also learned that she would be unable to transfer the franchise to Mr. Andrade and would remain liable for any management decisions he might make.

After conducting a trial in November 2017, the Virginia court issued the Order, concluding that Mr. Andrade was liable for half of the balance of the Andrade Loan, the LLC

Loan, and the Pianalto Loan. The court also the terminated the general partnership between Mr. Andrade and Ms. Hill and granted (a) judgment against Ms. Hill in favor of Mr. Andrade in the amount of $149,299.50 for half of the partnership profits; (b) judgment against Ms. Hill in favor of Mr. Andrade for $1,293.13 on account of the Andrade Loan; (c) judgment against Ms. Hill in favor of Andrade, LLC for $19,000 on account of the LLC Loan; and (d) judgment against Ms. Hill in favor of Mr. Pianalto for $19,500 on account of the Pianalto Loan.[1] The court's calculation of partnership profits was based, in part, on the "weekly draws" Ms. Hill had taken from the store.

After the trial in November 2017, Ms. Hill took an "additional draw" of $9,000 from the business to pay her legal bills and relocation expenses for her family members. She did not obtain Mr. Andrade's permission to make this withdrawal and did not believe she needed that permission because the partnership had been terminated. In December 2017, Ms. Hill terminated the franchise and stopped operating the store. Sometime later, she received a final settlement statement from 7-11 reflecting a deficit of $222.76. At no time did Ms. Hill decline to take funds due to her from 7-11 in order to avoid paying her creditors. She did not terminate the franchise or stop operating the store to avoid repaying her creditors. Instead, she made these decisions so that she could move to Maine to care for her family members.

## ANALYSIS

Mr. Andrade would like the Court to determine that Ms. Hill's debts to him are nondischargeable under 11 U.S.C. § 523(a)(4), which excepts "any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" from discharge. Id.

---

[1] The parties may have terminated the partnership by their conduct long before the trial. The Order may have simply clarified and formalized a preexisting state of affairs. On this point, the record does not permit a conclusive determination either way.

In Count I of his Amended Complaint [Dkt. No. 25] (the "Complaint"), Mr. Andrade challenges the dischargeability of Ms. Hill's debt to him for partnership profits. In Count II, he asserts that all of Ms. Hill's debts to him should be excepted from discharge because she engaged in embezzlement when she took the "additional draw" of $15,000 in October 2016 and the "additional draw" of $9,000 in November 2017.[2]

"Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's fresh start policy[.]" Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997) (quotation marks omitted). In light of the fresh start policy, Mr. Andrade bears the burden of proving that Ms. Hill owes him a debt for fraud or defalcation in a fiduciary capacity or for embezzlement. *See* Rutanen v. Baylis (In re Baylis), 313 F.3d 9, 17 (1st Cir. 2002) (quotation marks omitted). Coming close to making this showing is not quite enough. Mr. Andrade must show that the debt to him comes "squarely within" the exception provided by section 523(a)(4). *See* Palmacci, 121 F.3d at 786.

## I.     Embezzlement

"Embezzlement is the fraudulent conversion of the property of another by one who is already in lawful possession of it." Sherman v. Potapov (In re Sherman), 603 F.3d 11, 13 (1st Cir. 2010) (quotation marks omitted). To constitute embezzlement, "conversion must be committed by a perpetrator with fraudulent intent[.]" Id. The essence of the concept is the "knowing use of entrusted property for an unauthorized purpose[.]" Id. at 14. On one hand, the "retention of property in good faith, without secrecy or concealment, under a bona fide claim of

---

[2] The Complaint included several other counts seeking relief under 11 U.S.C. § 523(a)(19)(B), 11 U.S.C. § 727(a)(4), and 11 U.S.C. § 727(a)(5). The claims predicated on those statutes were dismissed before trial under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. *See* [Dkt. No. 54]. In Count II, Mr. Andrade also claimed that Ms. Hill embezzled certain funds other than the "additional withdrawals" of $15,000 in October 2016 and $9,000 in November 2017. At trial, however, he clarified that his embezzlement theory related solely to those two withdrawals. He also disclaimed any reliance on the larceny component of section 523(a)(4), clarifying that his case rests on the remaining provisions of the statute.

right based upon reasonable grounds, generally is inconsistent with a fraudulent intent to embezzle." Me. Bonding & Cas. Co. v. Crook (In re Crook), 13 B.R. 794, 798 (Bankr. D. Me. 1981) (quotation marks omitted). Where a debtor disposes of funds that have lawfully come into her hands, does not attempt to conceal that disposition, and has reasonable grounds to believe she has a right to use the money, the circumstances are not suggestive of a fraudulent intent. *See* id. On the other hand, where a debtor uses entrusted funds for his own purposes, with knowledge such use is unauthorized, fraudulent intent is manifest, rendering a conversion fraudulent and therefore an embezzlement. In re Sherman, 603 F.3d at 13.

Mr. Andrade's embezzlement claim relates, first, to the "additional withdrawal" of $15,000 in 2016, before the formal termination of the partnership in 2017. His claim also relates to the "additional withdrawal" of $9,000 in 2017, after the formal termination of the partnership. As to the $15,000 withdrawal, there are divergent views about whether it is possible for an individual to embezzle funds from a partnership in which the individual is a partner. Some courts deem it a legal impossibility for a partner to embezzle partnership property. *See, e.g.,* Hardesty v. Johnson, 126 B.R. 343, 346-47 (E.D. Mo. 1991). Other courts conclude that a partner commits embezzlement within the meaning of section 523(a)(4) by using partnership funds for her own use. *See, e.g.,* Adamo v. Scheller (In re Scheller), 265 B.R. 39, 53 (Bankr. S.D.N.Y. 2001). Ultimately, the Court need not decide which of the two camps has the better view because, as to both the $15,000 withdrawal and the $9,000 withdrawal, Ms. Hill did not have the requisite fraudulent intent. When she withdrew the $15,000 in 2016, she did not believe that she needed Mr. Andrade's permission because she thought she was operating as a sole proprietor. Ms. Hill may have misunderstood the parameters of the partnership, but none of the evidence suggests that misunderstanding was unreasonable. There is no indication that either of

the parties consulted with lawyers or other professionals regarding the parameters of their arrangement before Mr. Andrade filed suit in state court. In the absence of professional advice, a layperson in Ms. Hill's shoes might reasonably have misapprehended her authority vis-à-vis the enterprise. Later, when Ms. Hill withdrew the $9,000 in 2017, she did not in fact need Mr. Andrade's permission because the partnership had, without question, been terminated at that point in time. There is no evidence that Ms. Hill concealed either withdrawal. In short, Mr. Andrade did not show that Ms. Hill maintained the requisite fraudulent intent as to either of the challenged withdrawals. In the absence of that evidence, Mr. Andrade's prayer for relief in Count II must fail.

## II. Fraud or Defalcation in a Fiduciary Capacity

Mr. Andrade claims that the debt of $149,299.50 owed to him for half of the partnership profits should be excepted from discharge in Ms. Hill's chapter 7 case as a "debt . . . for fraud or defalcation while acting in a fiduciary capacity[.]" 11 U.S.C. § 523(a)(4). This is a defalcation case, not a fraud case. Mr. Andrade may have used the term "fraud" at trial, but he did not invoke the term in Count I or make allegations germane to such a claim in the Complaint. Further, even if that pleading were construed to include a claim sounding in fraud, the facts would not support a determination of nondischargeability based on fraud. Mr. Andrade did not identify a legal test for fraud within the meaning of section 523(a)(4). In the absence of input from either of the parties on this issue, the Court will use the test identified by the Ninth Circuit Bankruptcy Appellate Panel:

> "Fraud" under § 523(a)(4) means actual fraud. Actual fraud involves conscious misrepresentation, or concealment, or non-disclosure of a material fact which induces the innocent party to enter into a contract [or to take some other action]. To prove actual fraud, the plaintiff must prove: 1) defendant made a misrepresentation, concealment, or non-disclosure of a material fact; 2) defendant had knowledge that what he was saying was false; 3) defendant intended to

>induce plaintiff's reliance; 4) plaintiff justifiably relied; and 5) plaintiff suffered damage as a result.

Honkanen v. Hopper (In re Honkanen), 446 B.R. 373, 382-83 (B.A.P. 9th Cir. 2011) (citations omitted).  The record here contains no persuasive evidence that the debt for partnership profits arose because Ms. Hill made false statements about the partnership with the intent to deceive Mr. Andrade and induce his participation in the enterprise.  Simply stated, the debt arose because neither the parties' relationship nor the store performed as well as the parties hoped at the outset.  The debt did not have its genesis in fraud.

To render a debt nondischargeable for defalcation, a plaintiff must establish that the debt resulted from the defendant's defalcation while acting in a fiduciary capacity.  *See* 11 U.S.C. § 523(a)(4).  The element of defalcation requires proof that the defendant breached a fiduciary duty.  In re Baylis, 313 F.3d at 17.  That said, not every such breach amounts to defalcation.  Id. at 18.  Instead, the breach must be committed with "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."  Bullock v. BankChampaign, N.A., 569 U.S. 267, 269 (2013).  The standard of gross recklessness is met if the fiduciary:

>consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty.  That risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation.

Id. at 274 (quotation marks omitted) (citations omitted).  This high bar of gross recklessness guarantees "that the harsh sanction" of nondischargeability is reserved for those who affirmatively engage in misconduct.  *See* Denton v. Hyman (In re Hyman), 502 F.3d 61, 68-69 (2d Cir. 2007).  "The standard does not reach fiduciaries who may have failed to account for

funds or property for which they were responsible only as a consequence of negligence, inadvertence or similar conduct not shown to be sufficiently culpable." Id. at 69.

The element of fiduciary capacity also requires some explication. In the context of section 523(a)(4), the qualities of fiduciary capacity are governed by federal law. LaPointe v. Brown (In re Brown), 131 B.R. 900, 904 (Bankr. D. Me. 1991). As such, the "broad definition of fiduciary under nonbankruptcy law—a relationship involving trust, confidence, and good faith—is inapplicable[.]" Raso v. Fahey (In re Fahey), 482 B.R. 678, 688 (B.A.P. 1st Cir. 2012) (quotation marks omitted). In this context, fiduciary capacity does not consist of any duties arising out of constructive trusts or other trusts imposed by law as a remedy. *See* Davis v. Aetna Acceptance Co., 293 U.S. 328, 333 (1934) (explaining that the exception to discharge for defalcation does not address trusts that the law implies from contract); Anderson v. Ingeneri (In re Ingeneri), 321 B.R. 601, 605-06 (Bankr. D. Me. 2005) (concluding that a constructive trust does not provide a basis for fiduciary capacity under section 523(a)(4)). Instead, fiduciary capacity under section 523(a)(4) exists "only in circumstances constituting a technical or express trust." In re Brown, 131 B.R. at 904. The features of an express trust include an explicit declaration of trust, a clearly defined trust *res*, and an identified trustee and beneficiary. *See* In re Fahey, 482 B.R. at 687; In re Ingeneri, 321 B.R. at 605. A technical trust, by contrast, arises under common law or statute. In re Fahey, 482 B.R. at 688. In determining whether the common law gives rise to a technical trust, courts consider whether state law imposes fiduciary obligations on the defendant vis-à-vis the plaintiff and certain property. *See* id. Where the basis for a technical trust is statutory, the statute must define the trust *res*, identify the trustee's duties, and impose a trust prior to the wrong that gave rise to the debt. Id.

- 10 -

In this case, the parties did not create an express trust. As a result, the outcome turns on whether (a) the partnership resulted in a technical trust under the Virginia Revised Uniform Partnership Act, and (b) Ms. Hill consciously disregarded, or was willfully blind to, a substantial risk that she would violate her fiduciary duties to Mr. Andrade by failing to remit half of the partnership profits to him. Both prongs of this inquiry must be answerable in the affirmative for Mr. Andrade to prevail. As to the first prong, the Virginia Code imposes limited fiduciary duties of care and loyalty on a partner as to the partnership and the other partners. Va. Code Ann. § 50-73.102(A). In relevant part, a partner's duty of loyalty requires her to "account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct . . . of the partnership business[.]" Id. § 50-73.102(B)(1). For purposes of this decision, the Court assumes that this statute gives rise to a technical trust within the meaning of section 523(a)(4).

The second prong of the inquiry concerns Ms. Hill's intentions with respect to the duties she owed Mr. Andrade in light of their general partnership. Ms. Hill believed that the partnership terminated during the summer of 2012, shortly after the store began operating. As previously discussed, this belief was not unreasonable given the deterioration of the parties' business relationship and their apparent failure to secure professional guidance about the nature of a partnership at the outset of the enterprise, or at any time after that. None of the evidence suggests that the parties ever documented the nature of their arrangement to share partnership profits. Their testimony made clear that they did not even share a common understanding of the meaning of the term "profits" or the terms of the partnership more generally. At various points, the parties reached verbal agreements about the terms under which Ms. Hill would compensate Mr. Andrade, and it appears that she made good faith efforts to abide by those agreements. Nothing in the record suggests that Ms. Hill consciously turned a blind eye to her obligations as a

partner, or that a reasonable person in her shoes would have known that she was running an unjustifiable and substantial risk of violating her duties as a fiduciary by failing to remit half of her "weekly draws" to Mr. Andrade. It would have been prudent for Ms. Hill to consult a professional about the nature and extent of her obligations to her partner, and about the meaning of the term "profits" long before Mr. Andrade filed suit against her in state court. However, on this record, the Court does not find that Ms. Hill's failure to remit half of the partnership profits to Mr. Andrade rose to the level of gross recklessness as explained by the Supreme Court in Bullock. *Cf.* Pierce v. Stevens (In re Stevens), Adv. No. 13-50003, 2014 WL 6686497, at *8 (Bankr. N.D.N.Y. Nov. 25, 2014) (finding no basis to infer mental state required for defalcation where facts suggested that failure to account for profits may have been due to negligence). In the absence of evidence supporting a finding of defalcation, Mr. Andrade is not entitled to a determination of nondischargeability as to the debt for partnership profits.

## **CONCLUSION**

Mr. Andrade did not bear his burden of showing that Ms. Hill's debts to him should be excepted from her chapter 7 discharge. For this reason, a judgment will enter in favor of Ms. Hill on Counts I and II of Mr. Andrade's Complaint.

Date: November 22, 2019

Michael A. Fagone
United States Bankruptcy Judge
District of Maine